

**FILED**
CLERK, U.S. DISTRICT COURT

JULY 15 2021

**CENTRAL DISTRICT OF CALIFORNIA**
BY:_____RS_____DEPUTY

JUSTIN H. WILKES
  1727 ½ Webster Avenue
  Los Angeles, CA 90026
  Telephone: (360) 362-8172
  Email: justicewithjustin@gmail.com

Self-Represented

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN H. WILKES,<br><br>              Plaintiff,<br><br>    v.<br><br>NETFLIX, INC.,<br><br>              Defendant. | Case No.: **2:21-CV-05818-GW-MAAx**<br><br>**COMPLAINT FOR DAMAGES**<br><br>(1) RACE DISCRIMINATION<br><br>**JURY TRIAL DEMANDED** |

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3) because each United States district court subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this title. Federal question jurisdiction exists pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. 2000e-5(f)(3) because a substantial part of the events giving rise to this claim occurred in this district and because Plaintiff would have worked in this district but for the alleged unlawful employment practice by Defendant.

## INTRODUCTION

3.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, which prohibits employment discrimination based on race. This action alleges that Defendant discriminated against Plaintiff because of Plaintiff's race as Black or African American. Plaintiff seeks damages in an amount sufficient to compensate Plaintiff for Plaintiff's loss resulting from Defendant's conduct. Plaintiff hereby requests a jury trial on this matter.

## PARTIES

4.      Plaintiff JUSTIN H. WILKES is an individual and resident of Los Angeles County, California.

5.      Defendant NETFLIX, INC. is a Delaware domestic corporation, with its principal place of business at 100 Winchester Circle, Los Gatos, CA 95032.

## STATEMENT OF FACTS

**A.** **Defendant's Discriminated Against Plaintiff in Violation of Title VII of the Civil Rights Act of 1964**

6.     This is an action for damages based upon Defendant's practice of employment discrimination against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

7.     Plaintiff is Black or African American.

8.     Around May 24, 2020 and June 24, 2020, Plaintiff applied for two legal positions with Defendant. Defendant sought applicants to fill a Business and Legal Affairs Associate and a Counsel position in post-production studios all in Los Angeles, CA.

9.     Defendant intentionally discriminated against Plaintiff. As a result, Plaintiff suffered severe mental and emotional distress.

10.     On May 14, 2020, Defendant caused on numerous occasions Plaintiff interruptions with the positions. Defendant shared information with Plaintiff that Defendant's Talent team was in search of qualified candidates for the position. Defendant suggested that Plaintiff have a conversation with Defendant's Talent team. Defendant then coordinated an interview by telephone on May 29, 2020.

11.     On May 29, 2020, during an interview, Ms. Agero explained to Plaintiff

Defendant's hiring process. Ms. Agero shared numerous insights about the position. As a follow-up to their conversation on May 14, 2020, Ms. Agero noted new opportunities in legal with Plaintiff.

12.     Ms. Agero also explained having 21 years of in-house legal experience. Ms. Agero having owned and operated a firm for four. Ms. Agero shared running a couple of film companies, which provided Ms. Agero operational experience. Ms. Agero explained that this experience was critical in building out an infrastructure for Defendant's Legal team. Ms. Agero explained being partial to in-house legal practice, which Plaintiff found attractive. Ms. Agero emphasized specializing in drafting and having a broad swath of skills, which Plaintiff sought in a hiring manager.

13.     Ms. Agero shared a storied journey being hired by Defendant. Ms. Agero mentioned being placed on work travel to Iceland within the first week of the job. Ms. Agero shared Reed Hasting's famous quote "we suck compared to how good we are going to be" at a highpoint in their conversation. Ms. Agero concluded by referring Plaintiff to Defendant's Talent team for next steps.

14.     Following Plaintiff's interview on May 29, 2020, Defendant's conduct changed.

15.     On June 2, 2020, Ms. Agero referred Plaintiff to Defendant's Recruiter Sabrina Eisenbrei. Ms. Agero shared that Ms. Eisenbrei managed hiring for Ms. Agero's position. At the same time, Ms. Agero also referred Plaintiff for the Counsel

position separately. Ms. Agero shared knowing the hiring manager for the role. Ms. Agero shared that the role would satisfy Plaintiff's interest, which Ms. Agero garnered from their previous conversation.

16.    Ms. Agero then instructed Plaintiff to review Defendant's Culture Memo, which Defendant is famously known by as part of Defendant's hiring process. Ms. Agero shared that Defendant values curiosity and forthrightness. Ms. Agero shared that Defendant welcomes relevant questions regarding the Culture Memo during the interview process. Ms. Agero also explained next steps. Ms. Agero noted that:

> "…the usual process over here would be that you would formally apply for a position (through our website) and then one of our very capable screeners would schedule an intro call, then perhaps a talent recruiter would schedule a call to get to know a little more about you and determine whether it makes sense to move forward to a "manager screening" (which would mean speaking to the hiring manager for the role). There are steps beyond that, of course, but you've sort of skipped past the initial couple of screenings since you came to me directly and we have already had our initial conversation."

However, Defendant caused Plaintiff to complete the steps that Ms. Agero mentioned

that Plaintiff had surpassed.

17.   Concluding their conversation around next steps, Plaintiff began to question Defendant's motives.

18.   In a discussion around the coverage of the nationwide unrest and ongoing protests of George Floyd's death, which sparked protests across the nation, Ms. Agero mentioned "struggling to be a better listener and ally to the Black community." Ms. Agero commented that "I am profoundly saddened by the events that have led us here." Plaintiff felt uneasy.

19.   After each interview, Ms. Agero guided Plaintiff through the interview process. Ms. Agero provided Plaintiff support.

20.   Defendant then caused a delay in Plaintiff's following interview with Ms. Eisenbrei.

21.   On June 11, 2020, to further delay, Ms. Agero reached out to wish Plaintiff happy birthday, which further gave Plaintiff the impression that Plaintiff would be hired on with Defendant. At that time, Ms. Agero offered to nudge Ms. Eisenbrei once again to reach out to schedule an interview.

22.   Ms. Agero thereafter shared resources for Plaintiff to read to further prepare for the demands of the positions. Ms. Agero noted that the resources were critical to better craft language in deals negotiated by Defendant's Legal team.

23.     On June 19, 2020, Ms. Eisenbrei reached out to schedule an interview on June 24, 2020. The subject line of Ms. Eisenbrei's email stated "Refferal," which gave Plaintiff the impression that Defendant would hire Plaintiff for either of the positions.

24.     On June 23, 2020, June 24, 2020 and June 26, 2020, Ms. Eisenbrei asked questions during separate interviews that placed Plaintiff at a disadvantage. Ms. Eisenbrei, on both occasions, vaguely described the positions. Ms. Eisenbrei instructed Plaintiff to apply for the Counsel position. Plaintiff left the conversation still unclear regarding the demands of both roles. Plaintiff also left the conversation unsure whether Plaintiff was still being actively considered for the Business and Legal Affairs position.

25.     At each stage of the process, Ms. Agero provided guidance and support. Ms. Agero sometimes offered tips. Ms. Agero advised Plaintiff on how to proceed. Ms. Agero, however, paltered on several occasions.

26.     In preparing a response to an email on June 24, 2020, Ms. Agero shared that the hiring manager for the role was Ms. Giguère. Ms. Agero recalled an important part of the role at Netflix, where typically managers are looking for someone with expertise in their role, is that Ms. Giguère is willing to train somebody. Ms. Agero explained that Rachel wants someone astute and dedicated to the learn the role. Ms. Agero opined that post-production and visual effects was one of those growth

opportunities in the business, particularly in light of the circumstances. Ms. Agero opined again that so many post-production vendors are doing an immense amount of work for Netflix. Ms. Agero concluded that companies like Netflix and that there are not so many others with all the expertise in this area, which equals growth potential.

27.    On June 24, 2020, with regards to responding to Ms. Eisenbrei regarding an interview that day, Ms. Agero provided insights on negotiating post-production deals and contracts, handling media processing, delivery and asset management and noted production equipment, studio logistics, and light and grip. In addition to calling on other areas of expertise.

28.    On July 2, 2020, with regards to an interview scheduled with Ms. Giguère, Ms. Agero suggested that Plaintiff share with Ms. Giguère an interest in leading negotiations involving post-production deals with Technicolor globally.

29.    On July 3, 2020, Ms. Agero advised Plaintiff on completing the drafting assignment provided by Ms. Eisenbrei. Ms. Agero shared that Ms. Giguère sought in an ideal candidate the ability to draft clearly and concisely. Ms. Agero explained, as a manager, Ms. Giguère expected an ideal candidate to take calculated risks and exercise good judgment.

30.    Ms. Agero routinely provided Plaintiff assurances that Plaintiff's hiring experience was favorable. For instance, on July 13, 2020, Ms. Agero shared with Plaintiff to "be patient at this point and trust Sabrina will respond when there is

something to tell you. For sure no news is good news. Some people are taking some time off this month, sometimes it takes times to get responses and figure out next steps, etc." Ms. Agero resolved by stating "that this is a long game." Ms. Agero further reiterated that Plaintiff is building a relationship with Defendant's Talent team. Plaintiff, still, felt disrespected. Plaintiff also was made to feel calm in the same instance.

31. Defendant then caused a three-week delay in Plaintiff's interview schedule from June 26, 2020 until July 17, 2020. The delay related to Ms. Eisenbrei administering a drafting assignment. Plaintiff followed up during that time. Ms. Eisenbrei failed to respond.

32. On July 17, 2020, Defendant caused Plaintiff to receive a very challenging drafting assignment. Defendant intentionally set Plaintiff up to fail. The drafting assignment administered to Plaintiff explored a niche topic in the entertainment industry. Defendant acknowledged the assignment's level of difficulty by granting Plaintiff an extension to complete the assignment without Plaintiff having to ask. Defendant caused Plaintiff to suffer emotional distress.

33. On July 30, 2020, during Plaintiff's final interview, several interviewers asked Plaintiff questions that set Plaintiff up to fail. Others caused distractions. Defendant's Vendor Relations Manager Joe DiBianca allowed his dog to bark throughout Plaintiff's interview. Defendant's Manager of Production Planning Ben

Waller asked Plaintiff tough questions. Defendant's Counsel of Visual Effects Masha Koltsov entered the chat with wet hair in a seductive fashion, which caused Plaintiff's performance to suffer. Defendant's Director, Business and Legal Affairs, Studio Operations Ajay Chanayil gave Plaintiff strange stairs.

34.    However, one interviewer stood out. Defendant's Director of Physical Production Legal Robin P. Samms was kind to Plaintiff. Ms. Eisenbrei on the other hand scoffed at Plaintiff during their interview. Ms. Eisenbrei also ended Plaintiff's interview prematurely. Plaintiff felt demeaned.

35.    Following the final interviews, on August 4, 2020, Defendant's Talent Coordinator Noelle Ruiz prevented Plaintiff from sending follow-up emails to Plaintiff's interviewers. Ms. Ruiz explained a desire to forward Plaintiff's messages along to the team herself separately.

36.    On August 9, 2020, Defendant then led Plaintiff on one final time. Ms. Agero, in response to Plaintiff's message on the same day, shared that one final round of interviews were likely to occur. Defendant did not follow up with Plaintiff regarding either the Business and Legal Affairs or Counsel positions.

37.    On January 22, 2021, Defendant rejected Plaintiff for the Business and Legal Affairs and Counsel positions. On that day, Ms. Agero followed up with Plaintiff on LinkedIn about a separate position on Defendant's Legal team. Mr. Samms sought to fill a position. Ms. Agero suggested that Plaintiff apply for the

Associate, Physical Production Legal position, which was not a legal position. Plaintiff failed to respond.

**B.      The United States Equal Employment Opportunity Commission's Los Angeles District Office Discriminated Against Plaintiff After Rejection**

38.      Following Plaintiff's rejection, the Los Angeles District Office of the Equal Employment Opportunity Commission ("EEOC") sought to deprive Plaintiff of due process.

39.      In April 2021, on one occasion, the EEOC prevented Plaintiff from scheduling an intake interview. This occurred after Plaintiff filed a charge of discrimination against Defendant.

40.      The EEOC then, on several occasions, harassed Plaintiff with reminder emails. On April 9, 2021, April 10, 2021, April 11, 2021, and April 12, 2021, the EEOC sent Plaintiff reminders explaining that an intake interview was required to complete the filing process.

41.      Following the harassing emails, on April 7, 2021, Plaintiff filed a signed charge against Defendant with the Los Angeles District Office's Intake Supervisor Garrett Hoover. Mr. Hoover thereafter sought to impose further delays.

## CAUSE OF ACTION

**(For Race Discrimination in
Violation of Title VII of the Civil
Rights Act of 1964 by Plaintiff
Justin H. Wilkes against
Defendant Netflix, Inc.)**

42.     Plaintiff repeats and realleges the foregoing allegations with the same force and effect as if fully set forth herein.

43.     Plaintiff believes and alleges that race was a motivating factor in Defendant's decision not to hire Plaintiff in January 2021.

44.     Defendant subjected Plaintiff to discrimination as an applicant for the Business and Legal Affairs Associate, Strategic Knowledge Management position and Counsel, Post-Production and Studio Operations position. The Los Angeles District Office harassed and caused Plaintiff delays to follow.

45.     Defendant's conduct as alleged constitutes an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

46.     Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race. Section 703(a)(1), as codified in 42 U.S.C. § 2000e-2(a)(1) of the United States Code, provides that it shall be an unlawful employment practice for an employer:

> "to fail or refuse to hire or to discharge any individual, or
> otherwise to discriminate against any individual with respect to
> his compensation, terms, conditions, or privileges of
> employment, because of such individual's race, color, religion,
> sex, or national origin…"

Provided in section 703(a)(2), as codified in 2000e-2(a)(2) of the United States Code, it is impermissible for an employer:

> "to limit, segregate, or classify his employees or applicants for
> employment in any way which would deprive or tend to deprive
> any individual of employment opportunities or otherwise
> adversely affect his status as an employee, because of such
> individual's race, color, religion, sex or national origin."

As previously described in section 703(a)(1), section 703(m) further emphasizes that:

> "Except as otherwise provided in this title, an unlawful
> employment practice is established when the complaining party
> demonstrates that race, color, religion, sex, or national origin
> was a motivating factor for any employment practice, even
> though other factors also motivated the practice."

47.     In <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 429 (1971), the United States Supreme Court explained that:

> "the language of Title VII makes plain the purpose of Congress
>
> to assure equality of employment opportunities and to eliminate
>
> those discriminatory practices and devices which have fostered
>
> racially stratified job environments to the disadvantage of
>
> minority citizens."

<u>Griggs</u> held that:

> "What is required by Congress is the removal of artificial,
>
> arbitrary, and unnecessary barriers to employment when the
>
> barriers operate invidiously to discriminate on the basis of
>
> racial or other impermissible classification." <u>Id.</u> at 431.

48.     The United States Supreme Court, in <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981), defined the burden of proof under Title VII of the Civil Rights Act of 1964. <u>Id.</u> at 248. To establish a prima facie case of disparate treatment, <u>Burdine</u> provided that:

> "The plaintiff must prove by the preponderance of the evidence
>
> that [he] applied for an available position for which [he] was
>
> qualified, but was rejected under circumstances which give rise
>
> to an inference of unlawful discrimination." <u>Id.</u> at 253.

49.     In this case, Defendant's refusal to hire Plaintiff for the Business and Legal Affairs Associate position and the Counsel position violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

50.     As proscribed in section 703(a)(1), Defendant engaged in an unlawful employment practice when Defendant refused to hire Plaintiff for the Business and Legal Affairs and Counsel positions separately around January 22, 2021 because of Plaintiff's race as Black or African American. Plaintiff's claim for discrimination arose when Defendant rejected Plaintiff after Ms. Agero's comment around "struggling to be a better listener and ally to the Black community" on June 2, 2020 and Defendant's Legal team's decision to palter over hiring for both positions with Defendant.

51.     Defendant impermissibly limited, segregated and classified Plaintiff as an applicant because of Plaintiff's race. Defendant's conduct deprived Plaintiff of the Business and Legal Affairs and Counsel opportunities. Defendant's conduct resulted in Plaintiff being blackballed from Defendant's organization, as forbidden by section 703(a)(2).

52.     Race was a motivating factor for Defendant's employment practices against Plaintiff, as described in section 703(m).

53.     Similar to Griggs, Defendant fostered a racially stratified job environment to Plaintiff's disadvantage. Defendant caused Plaintiff to rely on Defendant's assurances during Plaintiff's hiring process. Defendant failed to assure equal employment

opportunity in these instances. As a result, Defendant also failed to eliminate discriminatory practices likely motivated by the pandemic and the political climate of today.

54.     Defendant sought to create artificial, arbitrary, and unnecessary barriers that prevented Plaintiff, as a member of a racial minority, from being selected for the Business and Legal Affairs Associate position and the Counsel position. The barriers imposed by Defendant, on numerous occasions, operated to invidiously discriminate based on Plaintiff's race and, as a result, disproportionately impacted communities of color.

55.     Plaintiff has suffered and will continue to suffer substantial losses in earnings and job benefits. Plaintiff has suffered and will continue to suffer mental and emotional distress, pain and suffering, all to Plaintiff's damage in an amount to be proven at trial. Plaintiff was rendered sick, sore and disabled, both internally and externally, and has suffered numerous internal injuries, such as severe fright, shock, pain and discomfort. The exact nature and extent of said injuries are not known to Plaintiff, who will request leave of court to insert the same when ascertained. Plaintiff does not at this time know the exact permanence of said injuries, but is informed and believes, and thereon alleges, that some of Plaintiff's injuries are reasonably certain to be permanent in character.

56.     Defendant intentionally engaged in the unlawful employment practice described against Plaintiff. Plaintiff, therefore, is entitled to an award of punitive damages against Defendant.

57.     Plaintiff has suffered damages and seeks all remedies available at law and in equity in an amount to be proven at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

1.     For affirmative action as may be appropriate.

2.     For each offense in an amount that may be determined by a jury.

3.     For a permanent injunction or other order to ensure full and fair consideration from Defendant if Plaintiff seeks similar employment in the future.

4.     For compensatory damages, including back pay, lost wages and benefits, emotional and mental distress, medical and related expenses, and other pecuniary loss not presently ascertained according to proof in an amount to be determined at trial.

5.     For punitive damages.

6.     For prejudgment interest on all amounts claimed.

7.     For any other equitable relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury of all issues so triable.

Respectfully submitted,

DATED:      July 15, 2021                          JUSTIN H. WILKES

By: _____
                                                              JUSTIN H. WILKES